*431 OPINION OF THE COURT
Leonard A. Weiss, J.
Petitioner, Tri-Co Electric Corporation, moves under CPLR article 78 for an order directing the Commissioner of General Services to audit, and upon satisfactory audit, to approve payment of the claim of petitioner herein and submit same to the Comptroller of the State of New York for payment in accordance with chapter 101 of the Laws of 1977.
Respondents, the Commissioner of General Services of the State of New York, and the Comptroller of the State of New York, move to dismiss under CPLR 7804 (subd [f]), admitting all the facts in the petition, but raising the legal objection that the petition fails to state a cause of action upon which recovery may be based.
The facts of this proceeding acquire special significance because they distinguish it from the cases offered by both petitioner and respondents in support of their respective arguments regarding the legal issues of "implied authorization” and "unjust enrichment or quantum meruitPetitioner, a New York corporation with its principal place of business in Orange County, New York, on December 15, 1976, executed and submitted to the respondents two contracts. The two contracts required petitioner to perform electric work in connection with providing service to security fences for the New York State Training School for Boys at Warwick, New York (Office of General Services [OGS] Project No. 28810E) and similar work for security fencing at the Otisville Correctional Facility in Otisville, New York (Project No. 28808-E), both being emergency contracts entered into without competitive bidding by New York State presumably either under section 25 of article III of the New York Constitution and/or subdivision 4 of section 103 of the General Municipal Law. The Warwick contract was in the sum of $3,062.81, and the Otis-ville contract was in the sum of $10,746.56. Of special significance is the fact that the electric work to be done by petitioner was underground wiring to go under fencing which was constructed by two other prime contractors, Dominick Dan Alonzo, Inc., and Anchor Post Products, Inc., both of whom were paid under chapter 101 of the Laws of 1977 for work they performed under similar emergency contracts. Both Dominick Dan Alonzo and Anchor Post received authorization to go ahead with construction from OGS by telegram, whereas petitioner received no such telegraphic authorization. It ap *432 pears that if petitioner had not completed underground wiring when it did, the State would have incurred additional cost by another contractor having to retrench underneath the fencing put up by Anchor Post and Dominick Dan Alonzo to complete the electric wiring required for the security fences at Otisville and Warwick. Moreover, the State had to be aware that petitioner began its work and was continuing its work and has interposed no objection to the quality of the work petitioner performed. On January 19, 1977, after the petitioner had performed its work, labor, services, and supplying of materials pursuant to the December 15, 1976 contracts, it was notified by telegram dated January 19, 1977 that the contracts were canceled in accordance with a decision by the New York State Supreme Court, which declared all contracts for the aforesaid projects void by reason of the State’s failure to secure competitive bids. On May 6, 1977, chapter 101 of the Laws of 1977 was signed by Governor Carey effective May 6, 1977 specifically authorizing the Comptroller, upon the approval of the Commissioner of General Services to audit and approve the payment of the claim of any contractor who, pursuant to a declaration of emergency by the Department of Correctional Services, was authorized by the Commissioner of General Services to proceed to perform public work on the Otisville and Warwick Correctional Facilities among others. It was pursuant to this legislation that contractors Dominick Dan Alonzo and Anchor Post Products were paid. On April 26, 1977 a new contract for work at the Otisville Correctional Facility was advertised and bid again by the State of New York with the work previously performed by petitioner omitted from the contract. This new contract designated No. D120539 was awarded to the petitioner and filed April 26, 1977. By letter dated March 20, 1979, OGS informed petitioner that although the original project at Warwick and Otisville were bid, no work was authorized and no contracts were awarded for such work and therefore no compensation can be paid for the work performed .on these projects.
Respondents continue to resist the payment to petitioner for its work on the original two contracts for the reason that the State Comptroller did not approve the original contracts, and also because OGS did not provide petitioners with a formal telegraphic authorization to begin work under said contracts. This court views the singular legal issue presented to it as follows: Under the unique facts as recited above, can the State *433 of New York deny payment to petitioner Tri-Co Electric Corporation under chapter 101 of the Laws of 1977 because Tri-Co Electric did not receive a formal telegraphic authorization to begin work by OGS?
Respondents contend that (1) the State can incur no contractual liability in the absence of compliance with subdivision 2 of section 112 of the State Finance Law which requires approval by the Comptroller before any contract made for or by any State department or agency in excess of $1,000 becomes binding upon the State, (2) that New York State cannot incur liability on a theory of estoppel or implied contract, and (3) that petitioners are not entitled to reimbursement under chapter 101 of the Laws of 1977 because such work was not authorized by the Commissioner of General Services of the State of New York in a formal telegraphic request.
At the outset this court observes that petitioner was functioning under an emergency contract with the State of New York. Section 25 of article III of the New York State Constitution gives the Legislature broad power to continue State and local governmental operations in periods of emergency and to adopt such other measures as may be necessary and proper for insuring the continuity of governmental operations. Section 15 of article III of the New York Constitution gives the Legislature authority to pass private or local bills which deal with a single subject. Subdivision 4 of section 103 of the General Municipal Law gives "the appropriate officer, board or agency of a political subdivision or district” the authority to act in a public emergency arising out of an unforeseen condition in circumstances affecting public property or the life, health, and safety of the inhabitants of a political subdivision or district in the State of New York. OGS and the Department of Correctional Services let the emergency contract at issue in this proceeding under the assumption that there was a condition of overcrowding at the subject correctional facilities which threatened the public health, safety and welfare. This court believes the determination of a public emergency, as any other governmental decision, lies within the discretion of the agency declaring such emergency, and is not subject to judicial review unless the decision is shown arbitrary, capricious, illegal, or in violation of lawful procedure. In view of the recent unrest in the corrections system and the findings of the Select Committee on Correctional Institutions and Programs (Report No. 4, Sept. 15, *434 1972), this court believes there was sufficient basis for OGS and the Department of Corrections to believe an emergency existed in the New York State prison system. Moreover, the executive and legislative branches of government tacitly recognized this public emergency and passed chapter 101 of the Laws of 1977 expressly to relieve private contractors who performed work under this emergency from the financial burden imposed on them because the State did not observe all the technical requirements of normal public bidding in awarding the subject contracts. Under normal circumstances, the Comptroller’s signature is unquestionably required by subdivision 2 of section 112 of the State Finance Law (see, e.g., Belmar Contr. Co. v State of New York, 233 NY 189). However, where a public emergency has been declared, and where as here, the executive and legislative branches of government have recognized that certain private contractors have performed work to the State’s benefit acting under the assumption that the contracts were properly awarded, this court believes there has been an express legislative waiver of the requirement that the Comptroller sign the contracts under subdivision 2 of section 112 of the State Finance Law.
Having found that there was a vaild contract between the State of New York and petitioner, the court proceeds to the issue of whether the State can be said to have given implied authorization to petitioner to commence work in the unique circumstances of this case. The leading case involving implied contract is Miller v Schloss (218 NY 400, 406-407) where the majority said: "A contract cannot be implied in fact where the facts are inconsistent with its existence * * * or where there is an express contract covering the subject-matter involved * * * or where an express promise would be contrary to law.” Miller (supra) was quoted with approval in Bradkin v Leverton (26 NY2d 192, 196). In considering whether OGS gave implied authorization to petitioner to proceed with work under the emergency contract, this court observes that the facts, as outlined above, are consistent with the existence of a contract, and moreover, any finding other than the existence of a contract would be contrary to both law and common sense. The implied authorization to begin work in this case can be found from the express authorization given to Dominick Dan Alonzo and Anchor Post Products, because petitioner’s work was integrally related to theirs, given that the electric wiring had to be installed prior to the installation of the fencing. The court therefore finds, under the circum *435 stances of this case, that OGS gave an implied authorization to petitioners to begin work and no express telegraphic authorization was necessary. In passing, this court observes that in Cassella v City of Schenectady (281 App Div 428, 432) the Appellate Division, Third Department, said: "Recovery may be allowed against a municipality in quasi contract for benefits received under an unenforceable contract where the invalidity of the contact was due to a mere irregularity or technical violation (e.g., Ward v. Kropf 207 N. Y. 467; cf. Rosasco Creameries, Inc., v. Cohen, 276 N. Y., 274)”. Additionally, the court observes that the New York Court of Appeals has expressed concern with governmental agencies becoming unjustly enriched at the expense of private individuals and quasi-public corporations (see, e.g., New York Tel. Co. v Town of North Hempstead, 41 NY2d 691, 699 [where the court denied the Town of North Hempstead the right to use inverse condemnation to gain access to the utility poles of New York Telephone Company]; Cahn v Town of Huntington, 29 NY2d 451, 455 [where express approval was given to the principle outlined in Cassella, supra]).
The court believes that any finding other than the existence of a contract under which implied authorization was given, in the circumstances of this case, will place New York State’s credit in the private construction community in serious doubt. The court therefore finds that petitioner has stated a valid claim for relief, dismisses the objection in point of law, and will grant petitioner the relief it seeks.